Opinion
 

 TAYLOR, P. J.
 

 —Defendant appeals
 
 [1]
 
 from a judgment of conviction entered on a juiy verdict finding him guilty of rape accomplished by threats of great and immediate bodily harm (Pen. Code, § 261, subd. 3) and oral copulation (Pen. Code, § 288a). He contends that: 1) the trial court erred in the admission of evidence of a prior uncharged offense; 2) the trial court committed prejudicial error by instructing the juiy as to the effect of his failure to deny or explain the evidence against him; and 3) he was deprived of the effective aid of counsel.
 
 [2]
 
 We have concluded that there is no merit to any of these contentions and that, for the reasons set forth below, the judgment must be affirmed.
 

 As there are no contentions concerning the sufficiency of the evidence, a brief summary of the pertinent facts, viewed most strongly in favor of the judgment,
 
 [3]
 
 will suffice. About 7 p.m. on Saturday, December 20, 1975, the victim, Ms. Sherman, a student, walked from her apartment at 1224 Leavenworth Street in San Francisco to 1817 California Street to attend a Christmas party at the residence of William Mabie. Ms.
 
 *813
 
 Sherman had never been to the Mabie residence before. While she was attempting to find the apartment building, she was approached by defendant who identified the building and also its nearby trade entrance doorway with rear steps leading to the apartment complex. He proceeded to lead Ms. Sherman, who followed cautiously. As she was leeiy of going down the steps she returned to the mail box area and located the one for the Mabie apartment; however, she could not find the right doorbell and entrance.
 

 Thereafter, defendant returned and reiterated his directions about the steps on the other side of the trade entrance doorway. After inquiring whether defendant was attending the same party and receiving a positive answer, Ms. Sherman cautiously followed him. Defendant grabbed her, clamped a gloved hand over her mouth, told her to keep quiet and dragged her into a dark garbage room. When defendant asked for money, Ms. Sherman indicated that she only had $1 and some change but would be glad to obtain more from her apartment or cash a check at a market. She asked defendant not to hurt her but he did not reply. She heard him take his pants off and was told to remove only her pantyhose and was forced into acts of oral copulation and sexual intercourse. Defendant indicated that he had lost a couple of years and was trying to make up for lost time. He then twice said “Don’t worry, I’m clean,” and opened the door so that she could find her clothes. In the light of the opened door, Ms. Sherman carefully observed defendant’s six-foot three-inch height, slender build, features, beard, haircut, sideburns, and clothing, including a new pair of fur lined gloves. On the basis of these observations and subsequent recollections, she positively identified defendant as her assailant.
 

 Ms. Sherman feigned tranquility after the incident and learned from defendant that his name was Ray and that he had been in prison for beating up a woman. Defendant disappeared after Ms. Sherman was buzzed into the Mabie apartment, where she called the authorities. She proceeded to a hospital where she was examined and found to be in an emotionally stunned and tearful condition. Ms. Sherman’s vaginal smear tested positive for sperm and seminal fluid, as did her underpants.
 

 She described defendant to two police officers and three days later identified defendant’s photograph from a series of 13 shown to her by Inspector Sullivan. During the arrest of defendant at his residence, Sullivan observed a pair of dark fur-lined gloves. Defendant maintained that the gloves belonged to his brother.
 

 
 *814
 
 On December 24, 1975, Sullivan advised defendant of his
 
 Miranda
 
 rights. Defendant waived his rights, denied the attack on Ms. Sherman on December 20 and claimed that on December 20, from 6:30 p.m. on, he was in the company of Ms. Walton, Ms. Jay and Ms. Kay at their residence at 1720 Golden Gate Avenue. Defendant indicated that since Ms. Walton was his girlfriend, he had no need to rape Ms. Sherman.
 

 Defendant’s girlfriend, Ms. Walton, testified that on the evening of the Sherman incident, defendant was with her from 5 p.m. until the next morning, except for a brief trip to the store which he made around 10-11 p.m. Defendant had discussed the Peguillan incident, discussed below, with her, admitted serving time for it, but indicated that he should not be blamed as he was a kid. Defendant admitted that his middle name was Ray and that at the time of the Sherman incident, he was unemployed.
 

 Defendant first claims error in the introduction of evidence pertaining to the following prior incident that had occurred on January 15, 1973:
 
 [4]
 
 About 5 p.m., Ms. Peguillan was parking her car at the intersection of Clay and Buchanan Streets (a short distance from the location of the attack on Ms. Sherman). After parking her car, Ms. Peguillan saw defendant jogging in place, and became frightened when defendant said hello. As she began to run away, defendant ran along beside her, attempted to make small talk, and then shoved her into a trash collection area between two houses. When she attempted to scream, defendant put his hands over her mouth and threatened to knock her down. After she pleaded with him not to hurt her, he replied he “hadn’t had any in a long time” and forced her into an act of intercourse. Afterwards, he asked her for a dollar, removed one from her purse and instructed her to stay inside until he left. She complied and then reported the incident to the police and provided a description of defendant and his clothing, including a long sleeved gold sweat shirt with “Chief’ on it.
 

 Her report was received by Officer Long and his partner who were on vehicle patrol nearby. After being informed that the suspect had run into the nearby Presbyterian Hospital, the officers ascertained that a person matching the description of defendant had been in the hospital and had made an appointment for an examination; for this purpose, he had provided his name, telephone number and an address a few blocks from
 
 *815
 
 the hospital. Long proceeded to the address and arrested defendant after observing a gold sweat shirt with “Chief’ on it that defendant identified as his own. Defendant denied the attack on Ms. Peguillan and indicated that from 5 p.m. that evening, he was at the Walton residence at 1720 Golden Gate Avenue. Defendant admitted at the instant trial that he had given Sullivan the same alibi at the time of the Peguillan incident.
 

 There was no error in the admission of the prior incident. Defendant’s alibi defense to the Sherman rape clearly placed in issue the question of identity. Evidence of other crimes is admissible to prove the identity of the perpetrator of the charged crime (Evid. Code, § 1101, subd. (b)). “[T]he inference of identity arises when the marks common to the charged and uncharged offenses considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses”
 
 (People
 
 v.
 
 Haston,
 
 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91]). “The strength of the inference in any case depends upon two factors: (1) the
 
 degree of distinctiveness
 
 of individual shared marks, and (2) the
 
 number
 
 of minimally distinctive shared marks” (italics in original;
 
 People
 
 v.
 
 Thornton,
 
 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267].)
 

 We think that the evidence in this case, viewed in the light most favorable to the People
 
 (People
 
 v.
 
 Thornton, supra,
 
 p. 746), establishes beyond any doubt the probative reliability of the Peguillan incident. The following distinctive features common to both offenses were also presented to the trial court at an in-chambers hearing to determine the admissibility of the Peguillan incident. Here, both offenses: 1) occurred at about the same time, 5 p.m. and 7 p.m., and in the same general vicinity, i.e., several blocks from one another and from defendant’s residence at 15 Middle Street; 2) began near an apartment house when defendant approached the .victim on a public street; 3) included defendant’s attempt to initiate a friendly conversation with the victim; 4) occurred in a garbage collection area near the street; 5) were initiated by the defendant’s sudden seizure of victims with his hand clamped over the mouth; 6) ostensibly were for the purpose of robbery, as each victim was asked for money; 7) occurred while both defendant and his victims were only partially disrobed; he removed only his pants and each victim, only her pantyhose; 8) were consummated in a short period of time; 9) defendant told the victims not to worry because he was not diseased and
 
 *816
 
 that he had not had sexual relations for a long time; 10) defendant engaged the victims in conversation after consummation of the crime; 11) neither victim sustained any physical injury other than the accomplishment of the sexual act; 12) each victim was a young attractive Caucasian woman; and 13) defendant offered the identical alibi defense —his presence at Walton’s residence within walking distance of each incident.
 

 We are aware of
 
 People
 
 v.
 
 Guerrero,
 
 16 Cal.3d 719 [129 Cal.Rptr. 166, 548 P.2d 366] (not cited by defendant), wherein the court observed thát the few common characteristics were of minimal distinctiveness.
 
 Guerrero
 
 is not apposite in the instant matter because of the numerous distinctive points of commonality detailed above. Accordingly, we conclude that evidence of the Peguillan offense was properly admitted on the issue of defendant’s identity, as it clearly, raises a reasonable and strong inference that defendant, the perpetrator of the Peguillan crime, was also the perpetrator of the instant crime
 
 (People
 
 v.
 
 Matson,
 
 13 Cal.3d 35, 38-40 [117 Cal.Rptr. 664, 528 P.2d 752];
 
 People
 
 v.
 
 Thornton, supra,
 
 and
 
 People
 
 v.
 
 Mendoza,
 
 37 Cal.App.3d 717, 723 [112 Cal.Rptr. 565];
 
 People
 
 v.
 
 Ricketts,
 
 7 Cal.App.3d 441 [86 Cal.Rptr. 647];
 
 People
 
 v.
 
 Wein, 69
 
 Cal.App.3d 79 [137 Cal.Rptr. 815]).
 

 We turn next to defendant’s contention concerning the error in the jury’s instruction as to defendant’s failure to testify. The record indicates that on March 11, 1976, after the People had rested and prior to the defense case, defendant’s attorney informed the court that he intended to call only one witness, and that defendant would not be testifying. Defendant’s counsel requested CALJIC instructions Nos. 2.60 (set forth below)
 
 [5]
 
 and 2.62. The People then withdrew the request for the No. 2.62 instruction. Subsequently, however, defendant testified and pursuant to his request, the court instructed the jury as follows, pursuant to CALJIC No. 2.62: “It is a Constitutional Right of a defendant, in a criminal trial, that he may not be compelled to testify. Thus, the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney.
 

 “In this case, the defendant has elected to, and has testified, as to certain facts.
 

 
 *817
 
 “If you find that he failed to explain or deny any evidence or facts against him which can reasonably be—which he can reasonably be expected to deny or explain because of the facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence, and as indicating that among the inferences that may be reasonably drawn therefrom, those favorable to the defendant are the more probable.
 

 “However, in this connection, it should be noted that if a defendant does not have the knowledge that he would need to deny or explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or to explain such evidence.
 

 “The failure of a defendant to deny or explain evidence against him doesn’t create the presumption of guilt or, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.”
 

 Defendant contends on appeal that the giving of the last three paragraphs of the above quoted instruction constituted prejudicial error as the court failed to modify the instruction to specifically set forth the matters that defendant had failed to explain or deny. He bases this contention on the fact that he had no opportunity to explain or deny the Peguillan incident because the trial court precluded the People from cross-examining him on that subject.
 

 This argument has no merit as the reason for the court’s ruling was that defendant failed to explain or deny the Peguillan incident or to even mention it in giving his alibi testimony on direct examination. Furthermore, as the record indicates that defendant requested the instruction, he is prevented by the doctrine of invited error from raising the matter on appeal (see generally, Witkin, Cal. Criminal Procedure (1963) §§ 469-472, pp. 476-479; 1975 Supp., pp. 610-615). The record also indicates that under the circumstances here presented, no revision of the instruction was appropriate. Although cross-examination of defendant about the Peguillan incident would have been perfectly proper, none was permitted by the court
 
 (People
 
 v.
 
 Ing, 65
 
 Cal.2d 603, 609-612 [55
 

 
 *818
 
 Cal.Rptr. 902, 422 P.2d 590];
 
 People
 
 v.
 
 Perez,
 
 65 Cal.2d 615, 619-622 [55 Cal.Rptr. 909, 422 P.2d 597];
 
 People
 
 v.
 
 Thornton, supra, p.
 
 760). Thus, the error favored defendant and not the People. Defendant has not been able to indicate how the error was prejudicial under the applicable standard of
 
 People
 
 v.
 
 Watson,
 
 46 Cal.2d 818 [299 P.2d 243], Furthermore, we note that the record also indicates that, as given, the instruction incorrectly directed the jury to draw a “favorable” inference from defendant’s failure to explain or deny the evidence against him.
 

 Finally, defendant maintains that, he was deprived of the effective assistance of counsel and refers to the following instances: 1) Failure to make a motion to dismiss under Penal Code section 995 or a timely Penal Code section 1538.5 motion to suppress evidence. Defendant has not indicated, and the record discloses no basis for these motions; 2) no effective new trial motion, as it was presented by different counsel; 3) almost every objection made was improper, incompetent and in the wrong form; 4) poor tactics in the choice of an alibi defense; 5) defendant’s counsel permitted the People to discover defendant’s defense; 6) defendant’s counsel supplied the People with a list of defense witnesses; and 7) defendant’s counsel lacked experience.
 

 The only question before us is whether defendant has demonstrated that as the result of any one or a combination of these seven alleged errors, his trial was reduced to a “farce or a sham” as required by
 
 People
 
 v.
 
 Ibarra,
 
 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].
 
 Ibarra
 
 set forth the general standard of reasonable effective assistance of counsel, set forth by the Fifth Federal Circuit Court of Appeals (15 Santa Clara L.Rev. 355, 381). We note here the specific and precise step-by-step outline for the reasonably competent assistance of a diligent advocate, as articulated by Judge Bazelon of the United States Court of Appeals for the District of Columbia Circuit, in
 
 United States
 
 v.
 
 DeCoster
 
 (1973) 487 F.2d 1197, at pages 1203-1204 [159 App.D.C. 326], and quoted in full below.
 
 [6]
 

 
 *819
 
 The courts have “ ‘uniformly declined the defendant’s invitation to second-guess his counsel’ ”
 
 (People
 
 v.
 
 Stanworth,
 
 11 Cal.3d 588, 612 [114 Cal.Rptr. 250, 522 P.2d 1058];
 
 People
 
 v.
 
 Miller,
 
 7 Cal.3d 562, 570 [102 Cal.Rptr. 841, 498 P.2d 1089]). This reluctance to exercise judicial hindsight depends on the fact that “ ‘. . . the decisions which counsel must make in the courtroom will necessarily depend in part upon what he then knows about the case, including what his own client has told him. There may be considerations not shown by the record, which could never be communicated to the reviewing court as a basis for its decision . . .’”
 
 (People
 
 v.
 
 Jenkins,
 
 13 Cal.3d 749, at p. 755 [119 Cal.Rptr. 705, 532 P.2d 857], citing
 
 People
 
 v.
 
 Garrison,
 
 246 Cal.App.2d 343, 350-351 [54 Cal.Rptr. 731]). An appellate court’s inability to understand why counsel acted as he did cannot be a basis for inferring that he was wrong.
 

 
 *820
 
 An attorney assigned to the defense of a criminal case is the manager of the lawsuit. He controls the court proceedings and has the authority and duty to determine all questions of strategy and trial tactics
 
 (People
 
 v. Strawder, 34 Cal.App.3d 370, 382 [108 Cal.Rptr. 901]). Therefore, the attorney may ordinarily waive his client’s rights as to matters of trial tactics and may select the witnesses to be called
 
 (People
 
 v.
 
 Williams, 2
 
 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008];
 
 People
 
 v.
 
 Floyd,
 
 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64]).
 

 Any claim of ineffective assistance of counsel necessarily is reduced to the question of whether the trial was fair and in accord with standards of due process. A fair trial does not include the right of the defendant to proceedings which are planned, directed or conducted by the defendant but, rather, proceedings that will accord the accused the fullest opportunity to preserve his rights and defend against the charges
 
 (People
 
 v.
 
 Strawder, supra,
 
 p. 382). Counsel is an advocate for, and not the alter ego of, the defendant (ABA Standards, Defense Function, p. 174). In any event, a claim of ineffective assistance of counsel is a question of judgment and degree that must be assessed in light of all the circumstances of the case and with a view to fundamental fairness
 
 (People
 
 v.
 
 Brown,
 
 26 Cal.App.3d 825, 846 [102 Cal.Rptr. 518]).
 

 Defendant does not explain why the People’s dismissal of count I of the information (assault with intent to commit robbery) reflects the incompetence of defense counsel. The record does not indicate why or under what circumstances this charge was dismissed. Nor can we see how the dismissal was harmful to defendant.
 

 As to the failure to make the Penal Code section 995 motion, we cannot engage in sheer speculation. Defendant’s only argument on the Penal Code section 1538.5 motion is that it was not timely made. The record, however, indicates that the fur lined gloves were not introduced at the preliminary hearing arid that at the trial the motion was made as soon as the basis for their admission became apparent. The only reasonable conclusion is that defendant failed to timely inform his counsel of the facts pertaining to the seizure of the gloves. His counsel was aware of the applicable law and made the suppression motion as soon as the grounds appeared
 
 (People
 
 v.
 
 Jenkins, supra).
 

 
 *821
 
 As to the motion for a new trial,
 
 [7]
 
 apart from the fact that new counsel appeared for this purpose, defendant has failed to specify legal deficiencies or incompetence reflected in the proceedings. Defendant here has not mentioned the specific grounds on which a motion for a new trial should have been sought by his new counsel. We conclude, therefore, that nothing in the proceedings on the motion for a new trial supports defendant’s contention that his counsel at those proceedings did not perform within the standards set forth above. The record indicates that the major issue at the trial was the admissibility of the Peguillan incident—a matter that was fully explored, argued and strenuously objected to throughout the trial by defense counsel.
 

 Defendant’s further claim that his trial counsel’s objections were “improper, incompetent and in the wrong form,” constitutes an additional generalization. He has not made any analysis or demonstrated that as a result thereof, prejudice occurred. The record does not indicate any improperly introduced evidence, or defenses forfeited. He also failed to specify how the purported incompetent objections reduced the trial to a farce or sham. Rather, to us, the record reveals that the defense counsel was confronted with overwhelming evidence of guilt and identification elicited from the victims of two offenses occurring in the same manner, in the same vicinity, and with the same alibi. Defense counsel did his best under adverse circumstances. While from the unassailable position of hindsight it could be argued that some of the objections may have been of tenuous merit, under the circumstances, defense counsel was performing his duty as a reasonably competent and diligent advocate.
 

 Nor do we see any merit in defendant’s contentions concerning the choice of strategy by his trial counsel. The record indicates that counsel pursued the only defense available, that of alibi.
 
 [8]
 
 Defendant’s alibi witness for both incidents, Ms. Walton, indicated that she believed everything defendant told her. Defendant’s use of the identical alibi for both incidents cannot be viewed as the result of defense counsel’s
 
 *822
 
 strategy.
 
 [9]
 
 The record indicates that defendant’s trial counsel focused on the possibility of misidentification: 1) as a result of the limited amount of light present at the time of the Sherman incident; and 2) in making an offer of proof that persons of one race often have difficulty identifying and distinguishing those of another. As to the latter, the court ruled that since it could not take judicial notice of that fact, the matter was properly within the purview of an expert. No expert testimony was proffered and the court’s ruling was proper.
 

 The trial counsel’s alleged lack of experience
 
 [10]
 
 is outside the record and, therefore, cannot be considered on this appeal
 
 (People
 
 v.
 
 Merriam,
 
 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161]). In any event the record discloses that defendant, throughout the trial, received the reasonable competent assistance of counsel acting as a diligent advocate, to which he is entitled. Defendant’s major dissatisfaction with his counsel pertained to the introduction of the Peguillan incident, which his counsel on appeal did not assert as a ground of incompetence.
 

 Finally, we turn to defendant’s contentions pertaining to lack of effective aid of his trial counsel who, pursuant to the then applicable rules,
 
 [11]
 
 apparently allowed the prosecution to discover his defense and witnesses.
 

 
 *823
 
 The only serious contention is that
 
 Allen
 
 v.
 
 Superior Court,
 
 18 Cal.3d 520 [134 Cal.Rptr.
 
 774,
 
 557 P.2d 65], which held that compelling disclosure of defense witnesses is a violation of the privilege against self-incrimination, as set forth in article I, section 15 of the state Constitution, should be applied to his case.
 
 [12]
 
 The
 
 Allen
 
 holding, unlike
 
 Prudhomme
 
 v.
 
 Superior Court,
 
 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], was based on state constitutional grounds and clarified that the rule first promulgated in
 
 Prudhomme
 
 was still the law in California, despite the intervening decisions of the United States Supreme Court.
 
 [13]
 

 As
 
 Allen
 
 v.
 
 Superior Court, supra,
 
 did not indicate specifically that it was to be applied prospectively only, we follow the retroactivity standards of
 
 People
 
 v.
 
 Gainer,
 
 19 Cal.3d 835, 853 [139 Cal.Rptr. 861, 566 P.2d 997]. The principles here applicable were recently summarized by this court (Division Four) in
 
 People
 
 v.
 
 Sanford,
 
 63 Cal.App.3d 952,
 
 [14]
 
 at pages 956-957 [134 Cal.Rptr. 155], as follows: “Where a rule of decisional law is enunciated as an application of a previously existing principle, it must be applied in all open cases. [Citation.] Where a new rule of law is stated, however, the retroactivity of a decision must be established by the court faced with the application of that ruling. That part of Duran which holds that restraints may not be imposed in the absence of a manifest need for such restraints is an application of the rule established in
 
 People
 
 v.
 
 Harrington
 
 (1871) 42 Cal. 165. However, that portion of Duran which holds that there must be a record showing of the need for restraints enunciates a new rule of law.
 

 “The critical factors for determination of retroactivity are (1) the purpose of the new rule, (2) the reliance by law enforcement authorities on the old rule, and (3) the effect on the administration of justice of retrospective application of the new rule. [Citation.] However, ‘the factors of reliance and burden on the administration of justice are of significant relevance only when the question of retroactivity is a close one after the purpose of the new rule is considered.’
 
 (In re Johnson
 
 (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].)”
 

 
 *824
 
 Our Supreme Court in
 
 In re Johnson, supra,
 
 noted and followed the policy of the United States Supreme Court of giving retroactive effect to decisions bearing on rights that directly affect the integrity of the factfinding process. We think the rule of
 
 Allen
 
 v.
 
 Superior Court, supra,
 
 which for the first time bases the previous ruling in
 
 Prudhomme
 
 on state constitutional grounds, clearly and directly affects the factfinding process.
 
 [15]
 
 In accord with
 
 Sanford, supra,
 
 and the recent decisions of our Supreme Court that take this middle course between complete retroactivity and complete prospectivity
 
 (People
 
 v.
 
 Gainer, supra,
 
 and see 6 Witkin, Cal. Procedure (2d ed., 1977 pocket supp.), § 705A, p. 79), we hold that
 
 Allen
 
 v.
 
 Superior Court, supra,
 
 necessarily applies to all cases pending on appeal on the day it was decided (Dec. 13, 1976), like the instant case.
 
 [16]
 

 Applying
 
 Allen
 
 v.
 
 Superior Court,
 
 to the instant case, we note that our Supreme Court held at page 525: “That standard plainly proscribes compelled defense disclosures which
 
 ‘conceivably might lighten
 
 the prosecution’s burden of proving its case in chief.’
 
 (Prudhomme
 
 v.
 
 Superior Court, supra,
 
 2 Cal.3d 320, 326; italics added.) A disclosure order which fails to meet that standard is constitutionally impermissible.” We do not think that in the instant case the disclosure of the alibi defense and name of the only witness conceivably lightened the prosecution’s burden of proof. Even assuming so, the error was not prejudicial under the applicable standards of
 
 Chapman
 
 v.
 
 California,
 
 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], and, therefore,
 
 People
 
 v.
 
 Watson,
 
 46 Cal.2d 818, 836 [299 P.2d 243].
 
 [17]
 
 Defendant’s only witness here, his girlfriend, on cross-examination, indicated that defendant had told her of the Peguillan incident, which only corroborated the previously properly admitted evidence pertaining to that incident. The violation of the state constitutional privilege against self-incrimination that occurred here is neither reversible error per se (cf.
 
 People
 
 v.
 
 Bostick,
 
 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529]) nor the kind of error that pervades the entire trial so as to deny due process and a fair trial
 
 (In re Gaines,
 
 63 Cal.2d 234 [45 Cal.Rptr. 865, 404 P.2d 473];
 
 People
 
 v.
 
 Butts,
 
 236 Cal.App.2d 817, 832 [46 Cal.Rptr. 362]).
 

 
 *825
 
 The judgment is affirmed, and the purported appeal from the motions for new trial dismissed.
 

 Kane, J., and Rouse, J., concurred.
 

 [1]
 

 Defendant’s notice of appeal erroneously states that the appeal is also taken from all proceedings on the motions for new trial. As these proceedings are merged into the judgment, the purported appeal from the new trial proceedings must be dismissed.
 

 [2]
 

 With commendable fairness and in the interest of judicial economy, the People have refrained from moving to strike defendant’s brief on appeal for its failure to comply with the requirements of California Rules of Court, rules 13, 15, 18 and 37.
 

 [3]
 

 Our summary of the facts is based on the record and the People’s brief with appropriate modifications and deletions.
 

 [4]
 

 At this time, defendant was a juvenile.
 

 [5]
 

 CALJIC No. 2.60: “It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. . .. You must not draw any inference of guilt from the fact that he does not testify,, nor should this fact be discussed by you or enter into your deliberations in any way.”
 

 [6]
 

 “Since ‘reasonably competent assistance’ is only a shorthand label, and not subject to ready application, we follow the approach adopted by the Fourth Circuit and set forth some of the duties owed by counsel to a client:
 
 “In
 
 General—Counsel should be guided by the American Bar Association Standards for the Defense Function. They represent the legal profession’s own articulation of guidelines for the defense of criminal cases. “Specifically—(1) Counsel should confer with his client without delay and
 
 as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.
 
 “(2) Counsel should promptly advise his client of his rights and take all actions
 
 *819
 
 necessary to preserve them. Many rights can only be protected by prompt legal action. The Supreme Court has, for example, recognized the attorney’s role in protecting the client’s privilege against self-incrimination.
 
 Miranda
 
 v.
 
 Arizona,
 
 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), and rights at a line-up,
 
 United States
 
 v.
 
 Wade,
 
 388 U.S. 218, 227 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967). Counsel should also be concerned with the accused’s right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pre-trial psychiatric examination or for the suppression of evidence. “(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversaiy system requires that ‘all available defenses are raised’ so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course,
 
 the duty to investigate also requires adequate legal research.
 
 “If a defendant shows a substantial violation of any of these requirements he has been denied effective representation unless the government, ‘on which is cast the burden of proof once a violation of these precepts is shown, can establish lack of prejudice thereby.’
 
 Coles by Peyton,
 
 389 F.2d 224, 226 (4th Cir. 1968). Two factors justify this requirement. First, in our constitutionally prescribed adversary system the burden is on the government to prove guilt. A requirement that the defendant show prejudice, on the other hand, shifts the burden to him and makes him establish the likelihood of his innocence. It is no answer to say that the appellant has already had a trial in which the government was put to its proof because the heart of his complaint is that the absence of the effective assistance of counsel has deprived him of a full adversary trial. “Second,
 
 proof ofprejudice may well be absent from the record precisely because counsel has been ineffective.
 
 For example, when counsel fails to conduct an investigation, the record may not indicate which witnesses he could have called, or defenses he could have raised. “Much of the evidence of counsel’s ineffectiveness is frequently not reflected in the trial record (e.g., a failure to investigate the case, or to interview the defendant or a witness before trial).
 
 As a result, ineffectiveness cases have often evolved into tests of whether appellate judges can hypothesize a rational explanation for the apparent errors in the conduct of trial. But neither one judge’s surmise nor another’s doubt can take the place of proof.”
 
 (Italics added.)
 

 [7]
 

 A motion for a new trial can be granted only on motion of the defendant (Pen. Code, § 1181) and either on the basis of one of the eight grounds specified by the statute
 
 (People
 
 v. Serrato, 9 Cal.3d 753, 760 [109 Cal.Rptr. 65, 512 P.2d 289]) or on nonstatutoiy grounds where failure to do so would result in a miscarriage of justice
 
 (People
 
 v.
 
 Oliver,
 
 46 Cal.App.3d 747, 751 [120 Cal.Rptr. 368];
 
 People
 
 v.
 
 Davis,
 
 31 Cal.App.3d 106, 109 [106 Cal.Rptr. 897]).
 

 [8]
 

 With hindsight that we need not discuss, defendant now argues on appeal that his counsel should have had him recant his alibi and attempt a defense of consent to the Sherman incident.
 

 [9]
 

 It is not sufficient for defendant to complain of poor strategy and tactics
 
 (People
 
 v.
 
 Floyd, supra,
 
 p. 709, cert, den., 406 U.S. 972 [32 L.Ed.2d 672, 92 S.Ct. 2418]). “ ‘Cases involving a failure to make these careful factual and legal inquiries and investigations necessary to a constitutionally adequate defense are to be distinguished, of course, from cases wherein counsel,
 
 having made such inquiries and investigations,
 
 makes tactical or strategic decisions—whether wise or unwise when viewed with the benefit of hindsight—which cause him not to utilize the fruits of his labors. . . .”’
 
 (People
 
 v.
 
 Jenkins, supra,
 
 p. 754.)
 

 [10]
 

 On appeal, defendant erroneously argues that he “tried to discharge his defense counsel when he found out it was defense counsel’s first jury trial”; that after the case “... defense counsel resigned from the Public Defender’s Office and found employment in a nearby city as a Deputy City
 
 Attorney
 
 [and]. . . was no longer on the Public Defender’s staff at the time of sentence”; and that “Appellant was so dissatisfied with defense counsel he took over conduct of the case and presented his defense without the assistance of effective counsel.”
 

 [11]
 

 The instant case was tried in March 1976. Defense counsel may well have thought that the rule of
 
 Prudhomme
 
 v.
 
 Superior Court, 2
 
 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], decided on April 1, 1970, had been overruled by
 
 United States
 
 v.
 
 Nobles,
 
 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160] (decided June 23, 1975), and
 
 Williams
 
 v.
 
 Florida,
 
 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893] (decided June 22, 1970). (See
 
 Allen
 
 v.
 
 Superior Court,
 
 18 Cal.3d 520, 524-525 [134 Cal.Rptr. 774, 557 P.2d 65].)
 

 [12]
 

 Allert, supra,
 
 was decided on December 13, 1976, almost nine months after defendant’s trial, which was pretried and set for trial on March 8, 1976.
 

 [13]
 

 We note that
 
 Allen
 
 was a four-three decision of our state Supreme Court. Clearly, defendant’s trial counsel cannot be held to a higher standard of competency as to whether the
 
 Prudhomme
 
 rule or the United States Supreme Court rule was applicable at the time of the instant trial.
 

 [14]
 

 Our state Supreme Court denied a petition for hearing in
 
 Sanford
 
 on February 3, 1977.
 

 [15]
 

 Thus, the instant case is distinguishable from
 
 Sanford, supra,
 
 wherein Justice Emerson (pro tern.) concluded that the on-the-record waiver requirement of
 
 People
 
 v.
 
 Duran,
 
 16 Cal.3d 282, 291 [127 Cal.Rptr. 618, 545 P.2d 1322], only indirectly affected the factfinding process and, therefore, should be applied prospectively only.
 

 [16]
 

 The instant notice of appeal was filed on June 18,1976.
 

 [17]
 

 As a state constitutional provision is involved, arguably, only
 
 Watson
 
 applies;
 
 Chapman,
 
 however, is the broader and preferable standard.