Filed 11/22/24  P. v. Olarte CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEMETRIO OLARTE,<br><br>    Defendant and Appellant. | F086092<br><br>(Super. Ct. No. MCR054679)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Poochigian, Acting P. J.,  Peña, J. and Smith, J.

Defendant Demetrio Olarte was convicted of two counts of lewd or lascivious acts on a child under the age of 14 years. Defendant's first trial ended in a mistrial. However, defendant's second trial resulted in a guilty verdict. The trial court sentenced defendant to six years in prison. On appeal, defendant claims his counsel was ineffective for failing to present defendant's character witnesses at the second trial, and the failure was prejudicial, compelling reversal of his judgment. We reject defendant's arguments and affirm.

## PROCEDURAL BACKGROUND

On July 1, 2017, the Madera County District Attorney filed an information charging defendant with two counts of lewd or lascivious acts on a child under 14 years (counts 1 and 2; Pen. Code,[1] § 288, subd. (a)). On June 20, 2019, after a trial by jury, the jury was unable to reach a unanimous verdict and the trial court declared a mistrial.

On June 8, 2022, the Madera County District Attorney filed an amended information charging defendant with two counts of lewd or lascivious acts on a child under 14 years (counts 1 and 2; § 288, subd. (a)) and also alleged the following aggravating circumstances and prior convictions as to both counts: defendant took advantage of a position of trust or confidence (Cal. Rules of Court, rule 4.421 (a)(11));[2] defendant engaged in violent conduct that indicates a serious danger to society (rule 4.421 (b)(1)); and defendant's prior convictions as an adult are numerous or of increasing seriousness (rule 4.421 (b)(2)).

On December 14, 2022, defendant was found guilty by a jury on both counts. At a bifurcated court trial, the trial court found true all three aggravating factors.

[1] All further undesignated statutory references are to the Penal Code unless otherwise indicated.

[2] All further rule references are to the California Rules of Court.

On March 27, 2023, the trial court sentenced defendant to an aggregate term of six years as follows:  on count 1, six years (the middle term) and on count 2, six years, to run concurrent to the term on count 1.

## FACTUAL BACKGROUND

When G was about 12 years old, she lived in a house with her father, Joel, and several extended family members, including her aunt, Margarita, her uncle, defendant, three older cousins, and her cousin's son.  One of G's older cousins, Yesmin, who also lived with G, is the daughter of Margarita and defendant.  G slept on a couch in the living room while she lived with defendant.

On some unrecalled date[3] around a holiday, when G was about 12 years old, a party occurred at the house.  Defendant drank alcohol and socialized with other family members in the garage.  G said defendant acted "drunk" and ran into the wall when he walked.  That night, G fell asleep on the couch she typically slept on while she lived there.  Defendant came into the house from the garage.  G was awakened by the sound of the garage door slamming shut, but she kept her eyes closed, pretending to still be asleep.  Then, defendant tugged on G's right shoulder, touched her breasts, and repeatedly kissed her on the lips.  G felt defendant's hands massage her breasts in a circular motion over her clothing and his mustache around her lips.  After about two minutes of kissing and touching G, defendant went back into the garage.

G began to cry.  She felt scared and alone.  About five minutes later, defendant came back inside and tried to turn G around, but she refused to let him.  Although G was awake, she pretended to be asleep and saw him standing over her.  As he stood over G, defendant showed signs of regret.  G observed defendant talking to himself, mumbling, " 'What did I do?' "

---

**3**     The information alleges counts 1 and 2 occurred between March 2, 2013 and March 1, 2016.  The testimony at trial is unclear as to the exact dates the alleged incident occurred, but it happened around the time G was 12 years old.

Shortly after, Margarita walked downstairs and angrily asked defendant what he was doing. Defendant said, " 'Nothing.' " She asked him again, and defendant responded, " ' Nothing. I'm doing nothing to her.' " Margarita told defendant to go back in the garage and she took G upstairs. At the top of the stairs, Margarita asked G why she was crying. G told her defendant touched and kissed her. Margarita told G to go to sleep and "stay quiet." She put G in Yesmin's bed at the top of the stairs. Margarita discouraged G from telling anyone about how defendant kissed her lips and touched her breasts because she did not want G to cause problems. G did not tell anyone, including Joel at that time. G continued to live in the house with defendant until the end of the school year, however, she avoided contact with him.

G and Joel moved away from defendant and into a house with other extended family members when G started middle school. G occasionally saw defendant at family gatherings and when Joel helped defendant with work. When G was about 16 years old, she told Joel that defendant had touched her breasts and kissed her lips on a night when they lived with him. Joel was angry and informed the police.

## A. The Pretext Phone Calls

On June 22, 2016, a detective arranged for G to place two pretext phone calls. During the call to defendant, G asked him whether he remembered when he was "drunk" in the living room one night while she was asleep on the couch when Margarita saw him. Defendant said he did not recall and said G may have been with someone else. G again asked defendant if he remembered "that night." Defendant said he did not remember. He repeatedly offered to buy G clothes and give her money. Defendant also said that "stupid" things happen when he is "drunk," and he thought he was in "the bar." Defendant denied touching G but apologized.

G also called Margarita. G told Margarita that she did not want to keep the "secret" that occurred on the night "about two years ago" from her father anymore. In response, Margarita said, "Does [defendant] keep bothering you … ?" Margarita then

4.

told G that if she told Joel, defendant could go to jail for many years. G reminded Margarita that she previously instructed her not to say anything. Margarita said, "Yes … because nothing else happened."

Then, Yesmin came on the line. The following colloquy occurred:

> "[Yesmin]: [W]hat is making you [want to] come … to your dad now? Like, what did [defendant] do?

> "[G]: … I just felt bad.

> "[Yesmin]: [B]ut what do you feel bad about?

> "[G]: … I don't know, like … when your mom told me not to say … anything.

> "[Yesmin]: [B]ut, what is making you [want to] tell your dad?

> "[G]: Because I feel bad … I don't [want to] keep this from him.

> "[Yesmin]: But if nothing happened, what's the point of telling your dad? Do you know the problem you can cause? Do you know if you told your dad, you will never be welcome into our home? Your dad will never talk to my parents again …. Do you know what problems you are [going to] cause for something [when] nothing happened?

> "[G]: [T]hat's why I feel bad because I don't [want to] cause any problems.

> "[Yesmin]: [T]hat's the thing, by you telling your dad you are [going to] cause a huge problem, a lot of problems, you know if you tell your dad, and your dad thinks that other things happened then you know that your dad can probably kill my dad or something? And that's [going to] be on your conscious [*sic*]."

At the end of the call, Yesmin reminded G that defendant "woke up [the] next morning and apologized" to G because he was "really drunk."

## B. The Defense

A detective interviewed G soon after she reported the incident to Joel. G reported to the detective that defendant came in from the garage, touched her breasts and kissed her lips, then returned to the garage. G also said that defendant reentered the house a few

5.

minutes later and kissed her a second time. The detective was surprised when G testified at trial that the second event did not occur.

Defendant said he never touched G's breasts or kissed her lips. Defendant said on the night of the alleged incident, he drank about two beers with three other people in the garage but was not intoxicated. He could not recall why he told G he was "drunk" during the pretext call. At some point that night, defendant entered the house, touched G's shoulder, and told her to go upstairs. Defendant said G was awake and using her phone when he touched her shoulder. After defendant told G to go upstairs to sleep, defendant returned to the garage and did not see G for the remainder of the night.

## DISCUSSION

### I.      Ineffective Assistance of Counsel Based on the Failure to Call Character Witnesses at Trial

Defendant argues defense counsel was ineffective in failing to present witnesses that would testify as to defendant's good character and G's character for dishonesty at his second trial. Defendant argues defense counsel's unreasonable withdrawal of the character witnesses requires reversal of defendant's convictions. The People respond the record sheds no light on why defense counsel omitted the character evidence in the second trial. Even so, there were reasonable, tactical reasons why defense counsel did not present evidence of defendant's good character at trial. The People further argue defendant suffered no prejudice because the evidence against defendant was compelling and strong. We agree with the People in both respects.

### A. Additional Background

#### 1. First Trial

At the first trial, the defense presented character evidence. A.M., defendant's 15-year-old niece, testified defendant never made her feel "uncomfortable" and she never noticed defendant interacting "with people" in a "sexual manner."

S.M., defendant's 13-year-old niece, testified defendant never made her feel "uncomfortable" and defendant never interacted with her in a "sexual way."

Raymundo, defendant's brother-in-law, testified he never saw defendant interact with "children" in a "sexual way." He further testified he did not ever witness defendant "interact sexually" with G or "inappropriately touch children when … intoxicated .…"

Moreover, A.M. and S.M. testified G was dishonest and a thief. A.M. and S.M. both testified that G "stole" a tablet a few years prior at Christmas by placing the tablet in her luggage. None of G's relatives could find the tablet; G said she did not take it. When her relatives found the tablet in her luggage, G started crying and said, " ' … I am sorry for taking it. I didn't mean to.' " S.M. testified that G felt bad for taking the tablet and it was her belief that G understood the difference between "right and wrong."

The trial court instructed the jury with CALCRIM No. 350 regarding the use of character testimony.

During deliberations, the foreperson asked the trial court two questions because the jury was having trouble reaching a verdict. The jury requested the court to reread Margarita's testimony regarding what she witnessed when she came downstairs and saw G with defendant on the night of the incident. The jury also wanted a readback as to G's testimony and defendant's testimony regarding the same event. Moreover, the jury requested the recordings of both pretext calls. The prosecution's burden of proof, beyond a reasonable doubt, was reread to the jury.

## 2. Second Trial

At the retrial, defense counsel did not present character witnesses.

Defense counsel requested the trial court instruct the jury with the voluntary intoxication instruction, CALCRIM No. 3426. Defense counsel argued the voluntary intoxication instruction should be given because the evidence showed defendant was intoxicated on the night of the incident. The prosecution argued there was not enough substantial evidence of defendant's intoxication because defendant testified he was not

7.

"drunk" and only had about two beers.  Defendant also told the detective he was not "drunk" and remembered the night.

The trial court concluded there was not enough substantial evidence that defendant was intoxicated, and, even if there was substantial evidence, there was no evidence that the intoxication was such that it affected defendant's formation of specific intent.

**Analysis**

To prevail on an ineffective assistance of counsel claim, defendant must establish both deficient performance and prejudice, that is, "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.)  Tactical errors are generally not deemed reversible, and counsel's decisions are evaluated in the context of the record. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)

The reviewing court must determine whether the record contains an explanation for the challenged conduct.  (*People v. Pope* (1979) 23 Cal.3d 412, 425 (*Pope*).)[4]  If the record sheds light on why counsel acted or failed to act in the manner challenged, the conviction will be affirmed if counsel's acts or omissions resulted from an informed tactical choice within the range of reasonable competence.  (See *People v. Fain* (1969) 70 Cal.2d 588, 600.)  In contrast, "where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate, the conviction should be reversed since the defendant has been deprived of adequate assistance of counsel."  (*Pope*, at pp. 425–426.)

However, in some cases the record on appeal is silent regarding why counsel acted or failed to act in the manner challenged.  These cases are affirmed on appeal "unless counsel was asked for an explanation and failed to provide one, or unless there simply

---

[4]    Overruling recognized on another ground in *People v. Delgado* (2017) 2 Cal.5th 544.

8.

could be no satisfactory explanation ….." (*Pope*, *supra*, 23 Cal.3d at p. 426.)  An assertion that counsel was ineffective on a silent record is more appropriately made in a petition for habeas corpus, which promotes judicial economy.[5]  (*People v. Dickey* (2005) 35 Cal.4th 884, 926; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

With these principles in mind, we turn to whether defendant received ineffective assistance for defense counsel's failure to call certain character witnesses at the second trial.  There is nothing in the record that shows the reason defense counsel did not call the character witnesses at defendant's second trial.  Defense counsel was not asked for an explanation, and there is nothing explicitly in the record that reveals defense counsel's basis for calling certain witnesses and not others.  We are not privy to defense counsel's discussions with his client, the witnesses, or the jury after the conclusion of the first trial to determine whether the jury may have found the character evidence persuasive.

Defendant argues the reason for defense counsel's failure to call the character witnesses is apparent from the record.  Defendant relies on defense counsel's theory at the second trial—defendant's intoxication—and argues that defense counsel's reliance on the voluntary intoxication defense, which would have negated specific lewd intent if proven, shows the reason for defense counsel's failure to call the character witnesses.[6] (See CALCRIM No. 3426.)  However, pursuit of a voluntary intoxication instruction at the second trial does not disclose the reason why defense counsel failed to call

---

[5]     A habeas corpus proceeding provides an evidentiary hearing and allows trial counsel the opportunity to set forth his or her reasons for acting or failing to act in the manner challenged.  (§ § 1483, 1484; *Pope*, *supra*, 23 Cal.3d at p. 426.)

[6]     Defendant argues that even though defense counsel failed to obtain the voluntary intoxication jury instruction, defense counsel still focused his main defense theory around defendant's intoxication, which distracted him from pursuing other theories, including presenting evidence of defendant's good character.

9.

defendant's character witnesses, especially since counsel still also pursued the theory that defendant did not commit the alleged actions.

Since the record before us does not show the reason why defendant's character witnesses did not testify, we cannot find ineffective assistance of counsel unless there is no conceivable tactical purpose for defense counsel's actions.[7] (*People v. Dickey*, *supra*, 35 Cal.4th at pp. 926–927; see also *People v. Earp* (1999) 20 Cal.4th 826, 896.)

## 1. Defendant Fails to Show Defense Counsel's Performance was Deficient

We turn to defense counsel's performance and determine whether there was a reasonable, tactical reason for defense counsel's failure to call the character witnesses. The decision whether to call certain witnesses is generally a matter of trial tactics and strategy, which a reviewing court may not second guess. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059; *People v. Bolin* (1998) 18 Cal.4th 297, 334 [whether to call certain witnesses is a matter of trial tactics, unless the decision results from unreasonable failure to investigate];[8] *People v. Williams* (1970) 2 Cal.3d 894, 905 [whether to call certain witnesses is a matter of trial tactics].) Here, the record does not demonstrate there could be no rational tactical reason for the omission of the character witnesses.

Defense counsel may have decided not to introduce evidence of defendant's good character because his own character was not unassailable. (Evid. Code, § 1102; *People v. Pangelina* (1984) 153 Cal.App.3d 1, 8 [evidence of the defendant's bad character is admissible in a criminal case only if he introduces evidence of his good character first].)

---

[7] Defendant's claims are more appropriately made in a petition for habeas corpus since the record before us sheds no light on why defense counsel acted the way he did. Defense counsel may then explain why the character witnesses were not presented. The court would be in a better position to evaluate whether defense counsel's actions fell within the range of reasonable competence by providing counsel with the opportunity to explain.

[8] Defendant does not allege defense counsel's ineffectiveness stemmed from his failure to investigate witnesses, nor does the record show defense counsel failed to investigate.

At defendant's first trial, there was testimony that a waitress at a restaurant observed "inappropriate contact" between defendant and G. The waitress could have been called to testify at the second trial, which would have impeached the character witnesses.

Defense counsel also may have reasonably concluded that the evidence of defendant's good character at the first trial was weakened by the close familial relationship between the witnesses and defendant.[9] Moreover, A.M. and S.M. were two young teenagers, and their story regarding G's dishonesty at the first trial was discredited on cross-examination when S.M. also testified that G knew the difference between "right and wrong." Given this, defense counsel may have reasonably concluded the character witnesses were not effective, especially since eliciting their testimony opened the door to defendant's bad character.

Defendant claims the voluntary intoxication defense was unreasonable because it caused defense counsel to ineffectively withdraw the character witnesses and fail to obtain an adjudication of the stronger of two potential meritorious defenses. In *People v. Ibarra* (1963) 60 Cal.2d 460, 466, defense counsel's failure to research the applicable law regarding the defendant's right to challenge the legality of a search and seizure of narcotics by law enforcement deprived the defendant of effective assistance because counsel was unaware of "a rule of law basic to the case; a rule that reasonable preparation would have revealed." Similarly, in *People v. Day* (1992) 2 Cal.App.4th 405, 419–420, this court held the failure of the defendant's counsel to present battered women syndrome was prejudicial, finding "the evidence was not only relevant, but critical in permitting the jury to evaluate [the defendant's] testimony free of the misperceptions regarding battered women" since the defendant claimed self-defense. The *Day* court held that the defense

---

**9**     We note Raymundo was extremely reluctant to testify at the first trial. He repeatedly said he did not want to be there and only agreed to testify because his wife, defendant's sister, requested he testify. A.M. and S.M. are Raymundo's young daughters, who were all living together at the time of trial.

11.

counsel's unawareness of the defendant's battered women syndrome made him unable to counter the prosecutor's contention that the defendant's conduct was inconsistent with self-defense. (*Id*. at p. 420.)

Ineffective assistance of counsel in *Day* and *Ibarra* was found because defense counsel failed to properly investigate the facts and was wholly unaware of the applicable law such that counsel in those cases could not reasonably formulate a meritorious defense. (*People v. Ibarra*, *supra*, 60 Cal.2d at pp. 465–466; *People v. Day*, *supra*, 2 Cal.App.4th at pp. 419–420.) In contrast, here, defense counsel vigorously pursued two theories at the second trial. First, defense counsel argued defendant did not commit the alleged claims. Defendant testified on his own behalf and said he never touched G's breasts or kissed her lips. Second, defense counsel argued voluntary intoxication; if defendant did commit the allegations, he was intoxicated and lacked specific intent. This is not a case in which defendant's attorney entirely failed to act, investigate, was unaware of, or failed to set forth any relevant evidence to support the defense. (C.f. *People v. Corona* (1978) 80 Cal.App.3d 684, 715–716 [defense counsel failed to investigate, inquire, read, or avail himself of any information relevant to the defense, which showed the decisions of the defendant's attorney were neither tactical nor strategic].) While no character witnesses testified, defense counsel did not abandon the theory that defendant did not commit the allegations. The record plainly shows defense counsel had a specific tactical approach and presented evidence and argument in support.

Further, although defense counsel was unsuccessful in obtaining a voluntary intoxication instruction because defendant said he was not intoxicated on the night of the incident, we do not find pursuit of a voluntary intoxication instruction amounts to ineffective assistance of counsel. It is apparent from the record defense counsel was influenced by the details of the pretext calls and the evidence, which showed defendant was intoxicated on the night of the incident. Given the jury was deadlocked at the first trial, it was also reasonable for defense counsel to attempt to pursue an alternate defense.

We conclude defendant fails to establish defense counsel's performance did not fall within the wide range of reasonable professional assistance.

## 2. Defendant Fails to Show Prejudice

Prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257; *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) Even if we were to conclude that counsel should have presented the character witnesses, it does not appear reasonably probable that a more favorable determination would have been reached. (See, e.g., *People v. King* (2010) 183 Cal.App.4th 1281, 1310–1311.)

Here, the prosecution presented strong evidence establishing defendant's guilt. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1166 [the defendant failed to show that prejudice resulted from defense counsel's alleged incompetence in failing to argue for the defendant's innocence and, thus, failed to establish claim of ineffective assistance of counsel considering the strong evidence against him].) G testified defendant approached her, touched her breasts, and kissed her several times on the lips for about two minutes. Defendant then returned to G a few minutes later and made statements of regret as he stood over her. G was emotional immediately after the encounter with defendant that night. This testimony is sufficient to sustain defendant's convictions. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 451–452 [uncorroborated testimony of a child victim may be considered substantial evidence to support a conviction of child molestation].)

Later, during the pretext call, defendant explained his actions by telling G he was "drunk" and thought he was in "the bar." Margarita and Yesmin's responses to G in the pretext calls provided additional corroboration to G's testimony that established defendant's guilt. Margarita and Yesmin's responses showed they had prior knowledge of the night when defendant touched and kissed G. When G confronted Margarita regarding

the "secret" she could no longer keep from her father, Margarita asked G, "Does [defendant] keep bothering you … ?" Yesmin then aggressively told G several times that "nothing happened." Further, Yesmin told G that defendant "woke up [the] next morning and apologized …."

Defendant argues that prejudice should be found because the outcome of a hung jury is more favorable as opposed to a guilty verdict. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520–521 [under the *Watson*[10] harmless error standard requiring a reasonable probability of a more favorable result, a hung jury is considered a more favorable result than a guilty verdict].) Defendant cites *People v. Kelley* (1967) 66 Cal.2d 232, 245 to support his argument that prejudicial error occurred due to the more favorable result in the first trial. There, the trial court excluded the defendant's admissions regarding his prior sexual conduct in the first trial, and the jury was unable to agree on a verdict. (*Id.* at p. 238.) In the second trial, the defendant's entire statement regarding his prior sexual conduct was admitted, and the defendant was convicted of committing a lewd act upon a child, among other things. (*Ibid.*) The Supreme Court held admission of the statement was prejudicial error in the second trial, in part because the first trial resulted in a hung jury and the second trial resulted in a guilty verdict. (*Id.* at p. 245.) However, the court noted that the two trials were substantially similar notwithstanding the admission of the defendant's statements, which demonstrated "almost to a certainty the prejudicial nature of the error." (*Ibid.*)

Here, the two trials had several differences. In addition to the testimony of A.M., S.M., and Raymundo, three additional witnesses testified at the first trial that did not testify at the second one. David B. and Elias B. testified at the first trial as to their observations of G and their interactions with defendant.

---

[10]     *People v. Watson* (1956) 46 Cal.2d 818.

Defendant's wife, Margarita, also testified at the first trial and corroborated defendant's version of events. Margarita was emotional at trial and testified she saw defendant only touch G's shoulder to wake her up. She said defendant never kissed G or touched her breasts. Both Margarita and defendant also said G did not cry or appear upset after her encounter with defendant that night, which further discredited G's testimony regarding defendant's conduct and how she silently cried after defendant kissed and touched her. Margarita did not testify in the second trial; there was no one to corroborate defendant's version of events.[11] Thus, while the jury could not decide on a verdict in the first trial, we cannot be certain that it was due to the introduction of the character evidence by A.M., S.M., or Raymundo, given that several other witnesses testified in the first trial.[12]

The lack of prejudicial effect is further shown by the questions the jury asked the trial court to assist them in reaching a verdict at the first trial. During deliberations, the foreperson asked the court to reread the testimony of Margarita, defendant, and G regarding the events that took place after Margarita came down the stairs and saw G and defendant together on the night of the incident. There were no questions regarding the character evidence from A.M., S.M., or Raymundo. It can be reasonably inferred from these circumstances at least part of the jury's indecision was due to the testimony of

---

[11]    In his closing argument at the first trial, defense counsel urged the jury to consider the lack of evidence supporting G's testimony and evidence that defendant's testimony was corroborated by Margarita.

[12]    We also note the prejudicial effect of the admission in *Kelley*, at the outset, was greater than in our case. The court in *Kelley* dealt with evaluating the "obvious" prejudice occurring from the erroneous admission of the defendant's prior sexual conduct. (*People v. Kelley*, *supra*, 66 Cal.2d at p. 245.) Here, we consider defense counsel's strategic decision not to call certain witnesses that would testify to defendant's character for not being a child molester. (See, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 989 [decision whether to call certain witnesses to testify at trial is generally based on trial tactics].)

Margarita, as set forth above, which corroborated defendant's testimony at the first trial, and the scales were not closely balanced as to the character evidence.

Defendant fails to show he was prejudiced by the outcome of the second trial.

## DISPOSITION

The judgment is affirmed.